IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01724-KLM

JEDON KERR, and
DEAN SCHILLER,

      Plaintiffs,

v.

CITY OF BOULDER, COLORADO, a municipality,
RYAN LORD, Officer, in his individual capacity,
N. BRETZ, Officer, in his individual capacity,
B. PLYTER, Officer, in his individual capacity,
LEAH RECH, Officer, in her individual capacity,
CHRISTOPHER C. REISS, in his individual capacity,
TIMOTHY KELLISON, in his individual capacity, and
DEPUTY SHERIFF JOHN DOES 1-10, in their individual capacity,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendants' **Combined Motion for Summary Judgment** [#48],[1] and on Plaintiffs' **Motion for Partial Summary Judgment** [#56]. Plaintiffs filed a Response [#59] in opposition to Defendants' Motion [#48], Defendants filed a Reply [#70], and, with the Court's permission, *see Minute Order* [#92], Defendants filed Supplemental Briefs [#94, #95], Plaintiffs filed a Supplemental Response [#98], and Defendants filed a Supplemental Reply [#101]. In addition, Defendants filed a Response

_____

[1] "[#48]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[#71] in opposition to Plaintiffs' Motion [#48], Plaintiffs filed a Reply [#73], and, again with the Court's permission, *see Minute Order* [#92], Plaintiffs filed a Supplemental Brief [#93], and Defendants filed a Supplemental Response [#99]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, Defendants' Motion [#48] is **GRANTED** and Plaintiffs' Motion [#56] is **DENIED**.[2]

## I. Summary of the Case[3]

In its simplest terms, the undisputed facts are that Plaintiffs, while wearing ski masks, used their cell phones to film the Boulder County Jail (the "Jail"), at least part of the time while walking on Jail property, and were subsequently detained and arrested. Given the large amount of audio and video evidence underlying this case, many of the facts are undisputed for purposes of adjudicating the present Motions [#48, #56].

The Boulder County Sheriff (the "Sheriff") has authority over and custody of the jails, including supervision of the inmates, and thus the Sheriff is responsible for the security and safety of Jail inmates, Sheriff deputies, and Sheriff employees. *See* Colo.

---

[2] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#21, #24, #47].

[3] The following facts are undisputed unless otherwise stated. *Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1195 (10th Cir. 2018) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."); *see also Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004) ("On cross-motions for summary judgment, . . . we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail."); *see also Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

Rev. Stat. § 30–10–511.  At the time of the incident, the Jail was comprised of five primary buildings: the administrative building containing the main entrance, lobby, courtroom, and administrative offices, and Buildings A, D, C, and B proceeding in counter-clockwise fashion around a central courtyard.  *Defs.' Ex., Aff. of Lydia Mitchell* [#48-2] ¶ 3.[4]

On December 28, 2018, at approximately 2:30 p.m., Plaintiffs began using their cell phones to film the Jail.  *Pls.' Ex. 5, Report of Jeffrey Brunkow* [#56-5] at 1-2.[5]  They started near the public driveway on the west side of the Jail.  *Pls.' Ex. 1* [#62] at 0:00-0:10.  Plaintiff Jedon Kerr's ("Kerr") video, which provides his perspective during the entire interaction, immediately begins with his statement: "Here at the Boulder County Jail, Boulder, Colorado.  Gonna do a public audit, First Amendment rights.  See if they respect our right to film in public."  *Defs.' Ex. 1* [#51].  Plaintiff Dean Schiller ("Schiller") also recorded video during the interaction, including video of his entry into a Jail building.  *Defs.' Exs. 2, 3, & 4* [#51].  Plaintiff Kerr's video, taken as he walked around, shows five signs which state: "Jail Security Area—No Trespassing."  *Defs. Ex. 1* [#51] at 06:58, 10:32, 10:38, 14:07, 15:04.  These signs indicated that certain sidewalks on the Jail

---

[4]  Defendants did not label Commander Lydia Mitchell's affidavit with an exhibit number.

[5]  The parties did not use a unified exhibit identification system, a decision which greatly hampered the Court's ability to efficiently sort through the evidence provided.  No letters were used to identify exhibits, and nearly every numbered exhibit has multiple exhibits connected with that number. For example, Exhibit 5 may refer to excerpts from the deposition of Defendant Lord, *see* [#99-5], excerpts from the deposition of Defendant Rech, *see* [#93-5], the City of Boulder's First Amendment Auditor Training Video, *see* [#59-5], Deputy Brunkow's supplemental incident report, *see* [#56-5], or an audio recording with Dispatch, *see* [#51].  In the absence of a viable alternative, the Court has used the same numbers the parties have used for their exhibits but has generally attempted to untangle the knots by referencing the party who filed the exhibit, the title of the exhibit, and/or the docket entry number.

grounds were restricted, and Plaintiffs chose to not go beyond those signs or into those restricted areas. *Pls.' Ex. 1* [#62] at 6:40-9:20, 10:40-11:00, 11:54-1205.

Deputy Sheriff Jeff Brunkow ("Brunkow"), a non-party, observed Plaintiffs wearing face coverings and filming near a secure area adjacent to the Jail's Building C. *Defs.' Ex., Aff. of Brunkow* [#48-1] ¶¶ 3-4.[6] Deputy Brunkow was in his personal vehicle, off-duty, and not wearing a uniform or a body-worn camera. *Id.* ¶¶ 3, 5. He therefore decided to call Boulder County Dispatch ("Dispatch") for assistance. *Id.* ¶ 5. Deputy Brunkow's call to Dispatch included the following exchange:

> *Brunkow*: There are two guys out here that have all faces masked up and all that stuff, and they're walking around doing a movie around Building C.
> *Dispatcher*: Building C?
> *Brunkow*: On their video camera.
> *Dispatcher*: Okay. See—
> *Brunkow*: They have balaclavas on and . . .
> *Dispatcher*: [typing] okay . . .
> *Brunkow*: [inaudible] that would be the City. Either one. Yeah. I think to the—
> *Dispatcher*: I can never remember if it's ours or theirs. If it's in or outside. We'll get someone though. Someone over there. They're near Building C, you said?
> *Brunkow*: Yeah, they're walking back over towards the—yeah they're right in front of Building C. One's got a green jacket on, blue jeans, a black balaclava on. The other guy's got a black hooded jacket and blue jeans with a white doctor's mask over his face.
> *Dispatcher*: [typing] okay.
> *Brunkow*: I would contact them, but I'm not in uniform, so—
> *Dispatcher*: Yeah, that's fine. Alright we'll let them—
> *Brunkow*: [inaudible] pull into the parking lot to see what they're doing. They're still videotaping everything around the Jail—
> *Dispatcher*: Okay.
> *Brunkow*: On their iPhones.
> *Dispatcher*: Sounds good.

---

[6] Again, Defendants did not label Deputy Brunkow's affidavit with an exhibit number.

*Defs.' Ex. 5, Dispatch Audio* [#51]; *see also Aff. of Brunkow* [#48-1] ¶ 5. Deputy Brunkow also relayed substantially similar information to Defendant Officer N. Bretz ("Bretz") after his arrival on scene. *Defs.' Ex. 6, Def. Bretz's Body Worn Camera Video* [#51] at 0:00-0:42; *Aff. of Brunkow* [#48-1] ¶ 8.

Dispatch placed a call to responding officers as follows: "Boulder County Jail at 3200 Airport Road, males with masks around the building filming, a male in black hoodies and blue jeans with a white doctor's mask and some other masks." *Defs.' Ex. 7, Police 1 Dispatch Recording* [#51] at 00:14-00:26. In a second call to Dispatch, Deputy Brunkow further reported that one of the individuals appeared to be carrying something heavy in the pocket in which he was hiding one of his hands. *Defs.' Ex. 8, BCSO Dispatch Audio*, [#51] at 00:12-00:19; *Aff. of Brunkow* [#48-1] ¶ 7. Dispatch relayed this to all of the responding officers as follows: "Also all units responding to the Jail be advised that one of the parties is now in the lobby still filming it . . . and one party is standing in the entrance holding something heavy in his hands, while his hands are in his pocket." *Defs.' Ex. 7, Police 1 Dispatch Recording* [#51] at 01:10-01:27.

Meanwhile, Plaintiffs continued to walk around and film, but they were not stopped or otherwise questioned until they stopped to film the garage at the Jail. *See Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 00:00-18:18. This is the location where Plaintiffs had their initial encounter with Defendant Bretz. *Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 18:37. From the time when Plaintiffs were originally questioned at this location until the time when they were arrested, they were on the property of the Jail. *Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 18:18-22:00. Both Plaintiffs were wearing face masks, Plaintiff Schiller was wearing a hood, and Plaintiff Kerr was wearing a ski mask that covered his face and head, all of

which left only their eyes visible to officers during the beginning of their encounter. *Defs.'*
*Ex. 6, Def. Bretz's Body Worn Camera Video* [#51] at 3:59; *Defs.' Ex. 9, Def. Lord's Body*
*Worn Camera Video* [#51] at 1:13.

When Defendant Bretz approached Plaintiffs and asked if they needed help,
Plaintiff Kerr said "no," then said "Sure, you can help me, why are you here?" *Defs.' Ex.*
*1, Pl. Kerr's Video* [#51] at 18:20-18:26. Defendant Bretz responded, "This is a jail, we
thought it was strange that you were out here with masks on." *Defs.' Ex. 1, Pl. Kerr's*
*Video* [#51] at 18:30-18:37. When asked about a third person with a dog who appeared
to be observing from the top of a nearby hill, Plaintiff Kerr responded: "I don't answer
questions." *Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 19:05-19:10. When Defendant Bretz
asked for the purpose of Plaintiffs' visit, Plaintiff Kerr responded, "personal use." *Defs.'*
*Ex. 1, Pl. Kerr's Video* [#51] at 19:42 -19:46. Plaintiff Kerr then said "we're just videoing,"
and, when asked for what purpose, he again said "personal use." *Defs.' Ex. 1, Pl. Kerr's*
*Video* [#51] at 19:55-20:01. Both Plaintiffs refused to provide identification. *Defs.' Ex. 1,*
*Pl. Kerr's Video* [#51] at 20:52-21:40; *Defs.' Ex. 3, Pl. Schiller's Video 2* [#51] at 2:58-
3:00, 4:18-4:20.

As described in more detail in the Analysis section below, Plaintiffs were detained,
handcuffed, searched, and arrested after more officers arrived on the scene, including
Defendant Officer Ryan Lord ("Lord"), Defendant Officer B. Plyter ("Plyter"), Defendant
Officer Leah ("Rech"), and, arriving later, Defendant Sergeant Christopher C. Reiss
("Reiss") and Defendant Timothy Kellison ("Kellison"). Plaintiff Kerr's video continues
through much of these events. *Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 20:30-22:00. One
officer picked up Plaintiff Schiller's phone and carried it for him, filming Plaintiff Schiller in

the process of moving him into a Jail building following his arrest. *Defs.' Ex. 4, Pl. Schiller's Video 3* [#51] at 2:05-11:27. The third person, i.e., the dog walker who may have observed some of the events from the nearby hill, was not recording anything and was not arrested, handcuffed, or booked into the jail, and Jail officials used no force against him. *Pls.' Ex. 7* [#62] at 6:00-9:40.

As a result of the foregoing events, Plaintiffs assert the following claims: (1) violation of Plaintiffs' free speech rights under the First Amendment, against all Defendants, *Am. Compl.* [#34] ¶¶ 36-52; (2) retaliation in violation of Plaintiffs' First Amendment rights, *id.* ¶¶ 53-66; (3) excessive force by Defendant Ryan Lord ("Lord") against Plaintiff Kerr, in violation of Plaintiff Kerr's Fourth Amendment rights, *id.* ¶¶ 67-78; and (4) unlawful seizure/unlawful search/false arrest in violation of Plaintiffs' Fourth Amendment rights, against all Defendants, *id.* ¶¶ 79-92. Plaintiffs seek unspecified "[d]eclaratory relief and injunctive relief, as appropriate," as well as compensatory and punitive damages. *Id.* at 17. In the present Motion [#48], Defendants seek entry of summary judgment in their favor on all claims. *See Motion* [#48] at 20. Meanwhile, in their own Motion [#52], Plaintiffs seek entry of summary judgment in their favor on all claims to the extent asserted against the individual Defendants. *See Motion* [#56] at 2.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).  The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded.

*See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or
>
> oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III. Analysis

### A.     Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Frasier*, 992 F.3d at 1014 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal alterations and quotation marks omitted)) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

Usually, "to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier*, 992 F.3d at 1014 (internal alterations and quotation marks

omitted).  Normally, the right must be clearly established "in light of the specific context of the case, not as a broad general proposition."  *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam).  However, "[w]e do not require a case directly on point, but existing precedent [nonetheless] must have placed the statutory or constitutional question beyond debate."  *Frasier*, 992 F.3d at 1014 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original)).  This means that, "under certain 'extreme circumstances' general constitutional principles established in the caselaw [sic] may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."  *Frasier*, 992 F.3d at 1015 (citing *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam)).

### 1.    Claims One and Two: First Amendment

#### a.    Claim One: Right to Film

Plaintiffs' first claim asserts a violation of their First Amendment right to free speech.  The asserted violation of their rights is *not* that they had a right to film law enforcement officers or their own arrest.  *Reply* [#73] at 1; *see, e.g.*, *Irizarry v. Yehia*, No. 20-cv-02881-NYW, 2021 WL 2333019, at *6 (D. Colo. June 8, 2021) (holding "that a right to record police officers performing their official duties in public, subject to reasonable time, place, and manner restrictions, exists under the First Amendment").  Rather, Plaintiffs assert the right to film the public areas of the Jail without being arrested.  *Reply* [#73] at 1 ("Being arrested for simply walking around a Jail and filming areas that were visible from public streets, sidewalks, and parks violates the First Amendment.").  Given this recitation of Plaintiffs' claim, Defendants' first argument is inapplicable, to the extent that Defendants argue that the Tenth Circuit Court of Appeals has not recognized First Amendment protection for recording law enforcement officers, while conceding that other

Circuit Courts of Appeals "have recognized the right of a **bystander** to film actions of law enforcement officers in public areas." *Motion* [#48] at 7 (emphasis in original) (citing *Mocek v. City of Albuquerque*, 813 F.3d 912, 930 (10th Cir. 2015); *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 3 (1st Cir. 2014); *Smith v. City of Cumming*, 212 F.3d 1332, (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 438 (9th Cir. 1995)); *see also Sandberg v. Englewood, Colo.*, 727 F. App'x 950, 963 (10th Cir. 2018) (discussing whether the First Amendment is violated when police officers prevent a person who is subject to police action from filming police activities).

Defendants next argue that "the right to film can be restricted in a non-public forum." *Motion* [#48] at 7 (citing *Mocek*, 813 F.3d at 930-32). They state that "[t]he jail property, including the adjacent curtilage, is a nonpublic forum in which First Amendment rights can be restricted." *Motion* [#48] at 7 (citing *Adderley v. Florida*, 385 U.S. 39, 46-48 (1966)). They aver that "[t]his is consistent with general First Amendment jurisprudence allowing for reasonable restrictions in nonpublic forums." *Motion* [#48] at 7 (citing *Brown v. Palmer*, 944 F.2d 732 (10th Cir. 1991) (en banc)). The Court notes here that there is no evidence that Plaintiffs were arrested for filming while *off* of Jail property, either on sidewalks adjacent to the public street or in the park located next to the Jail property. There is no dispute that, to the extent Plaintiffs were forced to stop filming, Plaintiffs were *on* Jail property when they were detained and arrested, and that they had been wandering on Jail property for a good portion of the prior fifteen minutes or so by that time. Thus, the first issue the Court must address is whether the Jail property was public, as Plaintiffs contend, or non-public, as Defendants contend. In other words, is the Jail property where

the arrests occurred a traditional public forum for free speech expression for purposes of the First Amendment?

In *Mocek v. City of Albuquerque*, 813 F.3d 912, 919 (10th Cir. 2015), the plaintiff "was arrested for concealing his identity after filming airport security procedures and being questioned on suspicion of disorderly conduct." The plaintiff had given his only form of identification to a travel companion who went ahead of him through security, and when asked for alternative proof of identity, like a credit card, he refused and began filming the encounter. *Mocek*, 813 F.3d at 920. The first legal issue was "whether there was reasonable suspicion to stop him and request his identity." *Id.* at 922. In deciding that there was, the Tenth Circuit Court of Appeals "emphasize[d] the uniquely sensitive setting we confront in this case," and that "[o]rder and security are of obvious importance at an airport security checkpoint." *Id.* at 924 (citing, in part, *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) (holding the location of an investigative stop is "a factor that contributes to an officer's reasonable suspicion"). The Circuit noted that, "[a]s a result, conduct that is relatively benign elsewhere might work to disturb the peace at these locations," that, "[f]rom a reasonable officer's perspective, [the plaintiff's] filming may have invaded the privacy of other travelers or posed a security threat, insofar as it could have been used to circumvent or expose TSA procedures," and that "[t]he possibility that he had malign intentions raised the likelihood that his conduct would compromise orderly operations at the checkpoint," as "did the chance that he was violating TSA regulations against interfering with security systems or personnel," including "resisting the agents' attempts to identify him." *Mocek*, 813 F.3d at 924. Relying at least in part on the specific location involved, the Circuit therefore concluded that, "the information available to [the

officer] indicated that [the plaintiff] had . . . potentially threatened security procedures at a location where order was paramount," which meant that "a reasonable officer would have had reason to believe, or at least investigate further, that [the plaintiff] had committed or was committing [the crime of] disorderly conduct." *Id.* Although an airport security checkpoint is different from jail property, the Court notes that both include areas where the public is permitted and both are nevertheless locations where "[o]rder and security are of obvious importance," as discussed further below. *See id.*

In *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1146 (10th Cir. 2020), the plaintiff was arrested and charged with trespassing at a community center for senior citizens which had been converted into a visitor center operated by Spaceport America, a change which the plaintiff had publicly protested over the course of several years. The Circuit first noted that "the Center is not the type of public forum in which the government must allow picketing and other forms of protest [the plaintiff] claims to have engaged in." *Fenn*, 983 F.3d at 1148. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property." *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985)). The Circuit stated that "[t]he Center is a city-owned building, leased to various entities, and we conclude it is a nonpublic forum." *Fenn*, 983 F.3d at 1148.

In reaching this conclusion, the Circuit stated: "In contrast, traditional public fora are places that 'by long tradition or by government fiat have been devoted to assembly and debate,' such as streets, sidewalks, and parks." *Id.* (quoting *Perry Ed. Ass'n v. Perry Local Ed. Ass'n*, 460 U.S. 37, 45 (1983)). Government property *could* be opened for

purposes of assembly and debate, the Circuit noted, but there was no indication that such had occurred under the circumstances of the *Fenn* case. *Fenn*, 983 F.3d at 1148 n.1 (stating that "a designated public forum is a place the government creates 'by intentionally opening a non-traditional forum for public discourse'" (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985)). The Circuit further explained:

> [T]he Center . . . has been leased to various tenants for specific uses, and is not used as a throughway or other pedestrian walkway. Even if the Center may have at one time been "open-to-the-public space," as [the plaintiff] puts it, that does not by itself confer the status of a traditional public forum. "The government may, by changing the physical nature of its property, alter it to such an extent that it no longer retains its public forum status." And while First Amendment restrictions in a nonpublic forum may still be challenged as unreasonable in light of the purposes they are intended to serve, [the plaintiff] has made no such argument here. Rather, he continues to insist that the Center is a traditional public forum for purposes of the First Amendment. It is not.

*Fenn*, 983 F.3d at 1148-49 (internal footnote and citations omitted). Here, similarly, the fact that Boulder County owns the Jail property does not *automatically* mean that the property is a traditional public forum on which individuals can freely engage in the full range of their First Amendment rights "without regard to the nature of the property." *See id.* at 1148.

In *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129-30 (1981), the United States Supreme Court addressed a challenge regarding access to letterboxes, stating in doing so:

> Indeed, it is difficult to conceive of any reason why this Court should treat a letterbox differently for First Amendment access purposes than it has in the past treated the military base in *Greer v. Spock*, 424 U.S. 828 (1976), the jail or prison in *Adderly v. Florida*, 385 U.S. 39 (1966), or the advertising space made available in city rapid transit cars . . . . In all these cases, this Court recognized that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government. In *Greer v. Spock*, the Court cited approvingly from its earlier opinion in

> *Adderly v. Florida*, wherein it explained that "'the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'"

(some internal citations omitted). In *Adderly*, thirty-two people had been arrested and convicted "on a charge of 'trespass with a malicious and mischievous intent' upon the premises of the county jail." 385 U.S. at 243. In its opinion upholding the convictions, the Supreme Court stated:

> Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. . . . Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff. . . . The sheriff, as jail custodian, had power, as the state courts have here held, to direct that this large crowd of people get off the grounds. There is not a shred of evidence in this record that this power was exercised, or that its exercise was sanctioned by the lower courts, because the sheriff objected to what was being sung or said by the demonstrators or because he disagreed with the objectives of their protest. . . . The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful civil rights demonstration was not only 'reasonable' but also particularly appropriate * * *.' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected . . . . The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose.

(internal citations and footnotes omitted).

These cases illustrate that jail property is not the type of publicly-owned property on which a citizen may exercise the full range of First Amendment rights anytime that he wishes. This conclusion does not change even assuming (without so finding) that Plaintiffs were standing or walking on portions of the Jail's property which are generally open to the public for ingress and egress purposes, for example by visitors to the Jail, or

16

for any other legitimate purpose.  In *Fenn v. City of Truth or Consequences*, 983 F.3d at 1148, the Tenth Circuit provided another example of this principle:

> In *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1287-88 (10th Cir. 1999), we held that the main walkway of the Denver Performing Arts Complex, which the city leased to several commercial and public agency tenants, was not a traditional public forum despite its high volume of public traffic.  We explained that although the walkway was generally open to the public, "[p]ublicly owned or operated property does not become a public forum simply because members of the public are permitted to come and go at will."  That is because "when government property is not dedicated to open communication, the government may—without further justification— restrict use to those who participate in the forum's official business."  We also noted in *Hawkins* that the walkway was not analogous to a public right of way or thoroughfare because it "does not form part of Denver's . . . transportation grid, for it is closed to vehicles, and pedestrians do not generally use it as a throughway to another destination."

The main walkway of the Denver Performing Arts Complex is, arguably, an even more public property than the Jail in terms of access and the number of people who frequent the location.  There is no evidence before the Court that the Jail property at issue here is part of a municipal transportation grid or is used as a throughway to other destinations. *See Hawkins*, 170 F.3d at 1287 (stating that the function of the Denver Performing Arts Complex's walkway "is simply to permit ingress and egress from [its] various complexes"). Thus, in light of the foregoing authority, the Court finds that the Jail property is not a traditional public forum for purposes of First Amendment analysis.

Having found that the Jail property where Plaintiffs were arrested is not a traditional public forum, the next step of the analysis is to determine what type of restrictions, if any, are constitutionally permissible on the Jail property.  In *Council of Greenburgh Civic Associations*, 453 U.S. at 132, after finding that letterboxes are not traditional public fora, the Supreme Court stated:

It is thus unnecessary for us to examine [the statute at issue] in the context of a "time, place, and manner" restriction on the use of the traditional "public forums" referred to above. This Court has long recognized the validity of reasonable time, place, and manner regulations on such a forum so long as the regulation is content-neutral, serves a significant governmental interest, and leaves open adequate alternative channels for communication. But since a letterbox is not traditionally such a "public forum," the elaborate analysis engaged in by the District Court was, we think, unnecessary. To be sure, if a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited "'merely because public officials disapprove the speaker's view.'" But in this case there simply is no question that [the statute at issue] does not regulate speech on the basis of content. While the analytical line between a regulation of the "time, place, and manner" in which First Amendment rights may be exercised in a traditional public forum, and the question of whether a particular piece of personal or real property owned or controlled by the government is in fact a "public forum" may blur at the edges, we think the line is nonetheless a workable one. We likewise think that Congress may, in exercising its authority . . . , properly legislate with the generality of cases in mind, and should not be put to the test of defending in one township after another the constitutionality of a statute under the traditional "time, place, and manner" analysis. This Court has previously acknowledged that the "guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'"

(internal citations omitted).

Thus, under the reasoning of *Council of Greenburgh Civic Associations*, the Court need not engage in a traditional "time, place, and manner" analysis given the finding that the Jail property is not a traditional public forum. *See also Perry Ed. Ass'n v. Perry Local Ed. Ass'n*, 460 U.S. 37, 45 (1983) (stating that "when government property is not dedicated to open communication, the government may—without further justification—restrict use to those who participate in the forum's official business"). There is no evidence here that, to the extent Plaintiffs were prevented from filming on jail property, that action was based on any content or message Plaintiffs were intending to convey—or, alternatively, what that message might even have been. *See Brown v. Palmer*, 915

F.2d 1435, 1445 ("Although the government is permitted greater latitude to regulate speech in a nonpublic forum, it must still regulate in a reasonable, viewpoint-neutral manner."). Plaintiffs point to the dog walker who was on the park property next to the Jail as an example of someone who was treated differently from them, but there is no evidence that this person entered Jail property or was filming in the area. *See Motion* [#56] at 3. Therefore, the Court cannot find that the presence of this person shows that Defendants were acting in a non-neutral manner. *See, e.g.*, *Fenn*, 983 F.3d at 1149 (noting that a plaintiff must point to "evidence in the record that he was arrested when other similarly situated individuals were not"). Thus, the Court finds that Plaintiffs did not have a First Amendment constitutional right to film while on Jail property.[7] This decision is further supported by the case law discussed below in connection with the clearly established prong of the qualified immunity test.

Alternatively, *even if* Plaintiffs had a First Amendment right to film Jail property while *on* Jail property, the Court finds that the individual Defendants are entitled to qualified immunity because, as of December 28, 2018, Plaintiffs did not have a clearly established First Amendment right to film on Jail property, as a non-traditional public forum. None of the cases cited by Plaintiffs as purportedly showing a clearly established right to film involves a non-traditional public forum, whether a jail or otherwise. They all involve traditional public fora like streets, sidewalks, and similar public spaces. For example, in *Turner v. Lieutenant Driver*, 848 F.3d 678, 683 (5th Cir. 2017), the plaintiff

---

[7] Of course, this is not to say that the appropriate government officials could not have *permitted* Plaintiffs to film on Jail property. To be clear, the Court merely concludes that Plaintiffs did not have a *constitutionally-mandated* right to film on such property.

was filming a police station "from a public sidewalk across the street from the station."  In *Smith v. City of Cumming*, No. 1:97-CV-1753-JEC, 1999 U.S. Dist. LEXIS 23875, at *14-15 (N.D. Ga. Jan. 12, 1999), *aff'd* 212 F.3d 1332, 1333 (11th Cir. 2000), "all videotaping [of the police] was performed on public property," all of which appears to have taken place on public streets given that the videotaping was of police officers and police cruisers purportedly "improperly stopping vehicles."  In *Bowens v. Superintendent of Miami South Beach Police Department*, 557 F. App'x 857, 863 (11th Cir. 2014), the plaintiff filmed police "while 'on a public street'" and on a "'sidewalk adjacent to the activity.'"  In *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014), the plaintiff filmed police officers who were "on the side of the highway" from her location in an adjacent school parking lot.  In *Frasier v. Evans*, 992 F.3d 1003, 1009 (10th Cir. 2021), a decision post-dating the events of this lawsuit, the filming occurred in a public parking lot.  The Tenth Circuit Court of Appeals held that the "right to record the police performing their official duties in public spaces" was not clearly established law in August 2014, although it declined to state whether such a right has been clearly established since that time.  *Frasier*, 992 F.3d at 1020-21.  None of these cases or any other case cited by Plaintiffs holds that they had a clearly established right to be on jail (or similar) property and film at will.  *See also Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688 (1959); *Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring); *Joseph Burstyn v. Wilson*, 343 U.S. 495, 502 (1952); *Fields v. City of Phila.*, 2017 U.S. App. LEXIS 12159 (3d Cir. July 7, 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595-96, 608 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 83-84 (1st Cir. 2011); *Anderson*

*v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Schnell v. City of Chicago*, 407 F.2d 1084, 1085-86 (7th Cir. 1969).

Accordingly, the Court finds that Defendants Bretz, Lord, Rech, Plyter, Reiss, and Kellison are entitled to qualified immunity and summary judgment in their favor to the extent Plaintiffs' First Amendment claim is asserted against them based on the purported right to film.

### b.    Claim Two: Retaliation

A First Amendment retaliation claim requires that: (1) the plaintiff was engaged in constitutionally protected activity, (2) the defendants' actions caused the plaintiff to suffer an injury which would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the adverse action taken by defendants was substantially motivated as a response to the plaintiff's exercise of the constitutionally protected conduct.  *Fenn*, 983 F.3d at 1148.

Plaintiffs argue that Defendants retaliated against them based on their purported right to film as well as on their right to free speech in connection with what Plaintiffs said to Defendants as they were being detained.  *Motion* [#56] at 14-15  The Court addresses each separately.

### i.    Right to Film

Of the six individual Defendants, this aspect of this claim appears to be asserted only against Defendants Lord, Bretz, Plyter, and Rech.  *See Motion* [#56] at 16 (stating that these four Defendants "contacted and arrested Plaintiffs because they were recording the Jail").  Defendants argue that "[t]he absence of a First Amendment violation,

and the Jail's legitimate security concerns, preclude a First Amendment retaliation claim." *Motion* [#48] at 7 (citing *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009); *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989); *Ramos v. Lamm*, 639 F.2d 559, 580 (10th Cir. 1980)).

In *Fenn v. City of Truth or Consequences*, 983 F.3d at 1148, the Tenth Circuit Court of Appeals held that the plaintiff's First Amendment retaliation claim failed for two independent reasons, one of which was that "[plaintiff] has not shown he was engaged in constitutionally protected activity because the [location at issue] is not the type of public forum in which the government must allow" the types of actions in which the plaintiff had engaged. As discussed at length above, Plaintiffs did not have a constitutionally protected right to film on Jail property, and therefore, as in *Fenn*, Plaintiffs have failed to establish the first element of their First Amendment retaliation claim. Thus, the Court finds that the individual Defendants are entitled to qualified immunity.

Accordingly, the Court finds that Defendants Bretz, Lord, Rech, and Plyter are entitled to qualified immunity and summary judgment in their favor to the extent Plaintiffs' First Amendment claim is based on retaliation in connection with the purported right to film.[8]

### ii.    Right to Free Speech

Of the six individual Defendants, this aspect of this claim appears to be asserted only against Defendants Reiss and Kellison. *See Motion* [#56] at 16 (stating that these two Defendants "ordered Plaintiffs['] continued arrest and jailing because they were

---

[8] To the extent this claim *may* be asserted against Defendants Reiss and Kellison as well, this analysis applies equally to them.

speaking in opposition to the officers' actions").  Defendants argue, in part, that this claim had not been properly raised prior to the filing of Plaintiffs' Motion [#56].  *Response* [#71] at 12.  However, even assuming that the claim is properly raised, the Court agrees with Defendants' further argument that "[t]he existence of probable cause for an arrest also negates any First Amendment retaliation claim."  *Motion* [#48] at 7 (citing *Mocek*, 813 F.3d at 931).

As the Court discusses below in connection with Plaintiffs' Fourth Amendment claims, Defendants had arguable probable cause to arrest Plaintiffs for trespass. Pursuant to *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019), a First Amendment retaliatory arrest claim fails where there is probable cause for the arrest on other grounds. *See also Fenn*, 983 F.3d at 1149 ("The presence of probable cause, therefore, is a bar to a First Amendment retaliation claim, and Fenn has not shown a lack of probable cause here.").  The "narrow exception" to this rule is where "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."  *Nieves*, 139 S. Ct. at 1727.  Here, Plaintiffs point to the man walking his dog in the park adjacent to the Jail property, but there is simply no evidence indicating that officers believed that man had ever been in a restricted area of Jail property or even on Jail property at all.  *Reply* [#73] at 5-6.  Thus, the Court cannot find that the dog walker was a similarly situated individual.

Accordingly, the Court finds that Defendants Reiss and Kellison are entitled to qualified immunity and summary judgment in their favor to the extent Plaintiffs' First

Amendment claim is based on retaliation in connection with the purported right to free speech.[9]

## 2. Claims Three and Four: Fourth Amendment  [STOP]

### a. Claim Three: Excessive Force

The Fourth Amendment excessive force claim is asserted solely by Plaintiff Kerr solely against Defendant Lord in his individual capacity.[10]  *Am. Compl.* [#34] at 1, 13.  The claim does *not* concern handcuffing, but only the pressure of Defendant Lord's knee on Plaintiff's back during the detainment/arrest.  *Response* [#59] at 19.

Plaintiffs' statements in their Motion [#56] appear to exaggerate the circumstances underlying this claim, in light of the fact that the only evidence to which Plaintiff Kerr cites is twenty seconds of his cell phone video.  *Motion* [#56] at 6 ¶ 36 (citing *Ex. 1* at 21:00-20).  In fact, the video does not support Plaintiff Kerr's statements in the brief.  First, the relevant events are not visible on the video because the camera is facing away from Plaintiff Kerr and toward the jail building during the relevant time.  At 21:04, Plaintiff Kerr can be heard saying "ow" loudly; at 21:06, he can be heard saying "ow" again very softly; and at 21:10, he can be heard saying "ow" a third time at a medium volume.  Then, at 12:11-15, he can be heard saying: "You don't need to put your knee on my back."  No other evidence is presented by Plaintiff.  Defendants point to body-worn camera video

---

[9]  To the extent this claim *may* be asserted against Defendants Bretz, Lord, Plyter, and Rech as well, this analysis applies equally to them.

[10]  In the Amended Complaint [#34], Plaintiffs also discuss the City of Boulder in connection with this claim.  *See* [#34] ¶¶ 74-77.  However, the portion of the Amended Complaint which comprises the claim states that it is asserted only by "Plaintiff Kerr Against Defendant Lord."  *Id.* at 13.  Given this unequivocal statement, and in the absence of any obvious indication otherwise in the briefs, the Court addresses Claim Three only as it pertains to Defendant Lord.

evidence showing that, before Plaintiff Kerr was handcuffed, Defendant Lord put his knee on the back of Plaintiff Kerr's leg, just above the knee. *Motion* [#48] (citing *Ex. 10* at 1:41). At the time when Plaintiff Kerr said "ow" three times and made the comment about the knee in his back, Plaintiff Kerr was not handcuffed. *Motion* [#48] (citing *Ex. 10* at 1:48-2:01).

The Court examines whether the force purportedly used by Defendant Lord was "reasonable under the facts and circumstances presented." *See Fogarty v. Gallegos*, 523 F.3d 1147, 1159 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court must "assess[ ] the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1287-88 (10th Cir. 2008). In making this assessment, the Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This test is used regardless of whether probable cause exists for the arrest itself. *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("[I]n a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.").

Considering the first *Graham* factor, i.e., the severity of the crime at issue, Plaintiff Kerr was detained for trespass, a relatively minor violation of law. *See Graham*, 490 U.S.

at 396; *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016) (stating that "[a] minor offense—at most—support[s] the use of minimal force"). Considering the third *Graham* factor, there is no evidence that Plaintiff Kerr actively (as opposed to verbally) resisted arrest or attempted to evade arrest by flight. *See Graham*, 490 U.S. at 396. These two factors therefore clearly weigh against the use of significant force.

Considering the second *Graham* factor, i.e., whether the suspect poses an immediate threat to the safety of the officers and others, the Court finds that this factor does not weigh in favor of the use of *significant* force but that it does weigh in favor of some use of force. Plaintiff Kerr had been meandering about the Jail grounds with no known business for approximately 15-20 minutes at the time he was detained, he was wearing a ski mask which covered most of his facial features, he was taking video of potentially sensitive portions of a Jail building, and he refused to provide his name to officers. At the time Defendant Lord allegedly put his knee on Plaintiff Kerr's back (an action which is not demonstrated by the video evidence cited by the parties here), less than a minute had passed since Plaintiff was detained, he was not handcuffed, and it was unknown whether he had any weapons or whether his business on Jail property was malignant or benign. *See Buck*, 549 F.3d at 1287-88 (stating that the Court must "assess [ ] the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances"). In fact, Dispatch had conveyed information from Deputy Brunkow that at least one of the two Plaintiffs had his hand in a pocket and there seemed to be something heavy in that pocket, a statement which could indicate the possible presence of a weapon. In addition, although certainly not dispositive, there is no

evidence that Plaintiff was injured from the encounter aside from his saying "ow" three times. *See United States v. Rodella*, 804 F.3d 1317, 1328-29 (10th Cir. 2015) (stating that there is no "de minimus injury requirement for Fourth Amendment excessive force claims in cases which involve more than handcuffing"); *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (stating that "[t]he extent of injury may . . . provide some indication of the amount of force applied").

This is not a case like *McCowan v. Morales*, 945 F.3d 1276, 1286 (10th Cir. 2019), where, although a fully compliant non-threatening misdemeanant arrestee was involved, the arrestee was handcuffed at the time of the alleged force. *See, e.g.*, *Sexton v. City of Colorado Springs*, No. 20-cv-00108-PAB-KMT, 2021 WL 1210375, at *9 (D. Colo. Mar. 31, 2021) (distinguishing *McCowan* on the basis of whether the arrestees were handcuffed); *see also Grass v. Johnson*, 322 F. App'x 586, 590 (10th Cir. 2009) (holding that excessive force was a question for the jury where the officer purportedly used force against a cooperative arrestee after he had been handcuffed). In other informative cases, the use of force was *much* greater than that used against Plaintiff here. *See, e.g.*, *Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007) (unrestrained, non-fleeing, non-dangerous misdemeanant was tackled, tased, and beaten); *Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir. 1991) (investigative stop of a plaintiff not suspected of committing a crime where officer kicked him, hit him in the stomach with a metal flashlight, choked him, and beat him). These cases hold that, even viewing the facts in a light most favorable to Plaintiff Kerr, Defendant Lord was constitutionally permitted to utilize the minimal force he used to restrain Plaintiff Kerr prior to being handcuffed. The Court is unaware of any case where this level of force has been found to be a constitutional violation. In short,

"Plaintiff was unrestrained and [Defendant Lord] was entitled to use some force to effectuate the arrest." *Sexton*, 2021 WL 1210375, at *10 (citing *Graham*, 490 U.S. at 396).

Even viewing the scant evidence in a light most favorable to Plaintiff Kerr, the Court finds that there is no genuine issue of *material* fact and that no reasonable jury could find that Defendant Lord used excessive force on Plaintiff Kerr in violation of his Fourth Amendment rights based on the placement of Defendant Lord's knee on Plaintiff's body. *Graham*, 490 U.S. at 396 (stating that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment") (internal quotation marks and citation omitted); *A.M. v. Holmes*, 830 F.3d 1123, 1151 (10th Cir. 2016) (stating that officers have the right to use some degree of physical coercion to effect an arrest).

Accordingly, the Court finds that Defendant Lord is entitled to qualified immunity and summary judgment in his favor regarding Plaintiff Kerr's excessive force claim.

### b.    Unlawful Seizure/Unlawful Search/False Arrest

Plaintiffs do not clearly specify which events underlying Claim Four serve as the basis for their assertion of an alleged "unlawful seizure," versus an alleged "unlawful search," versus an alleged "false arrest." The term "seizure" is broader than an "arrest" and may encompass investigative detentions. *Ellsworth v. City of Broken Arrow, Okla.*, __ F. App'x __, __, No. 20-5032, 2021 WL 1040483, at *3 (10th Cir. Mar. 18, 2021). An investigative detention (which appears to be the basis for the "unlawful seizure" portion of this claim, given the separate assertion of "false arrest") requires "reasonable suspicion" that a person has committed, is committing, or is about to commit a crime. *Id.*

(quoting *United States v. Windom*, 863 F.3d 1322, 1328 (10th Cir. 2017))); *Fenn*, 983 F.3d at 1149 ("has committed or is about to commit" (quoting *Cortez*, 478 F.3d at 1116)). Once an investigative detention becomes an arrest, probable cause is required or else it is a "false arrest." *Cortez*, 478 F.3d at 1130 (discussing when law enforcement actions transform an investigative "detention into an arrest requiring probable cause"). Each of these aspects of Claim Four is addressed separately below.

### i. Unlawful Seizure

"In evaluating a seizure, 'we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1327). "Although a seizure generally requires probable cause, the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), 'recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security . . . based on less than probable cause." *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1327). "Under *Terry*, an investigative detention only requires reasonable suspicion." *Ellsworth*, 2021 WL 1040483, at *3 (citing *Cortez*, 478 F.3d at 1115). "But 'if a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be supported by probable cause.'" *Ellsworth*, 2021 WL 1040483, at *3 (quoting *United States v. Chavez*, 660 F.3d 1215, 1223 (10th Cir. 2011)). Thus, in connection with an investigatory detention, the Court considers: (1) "whether the stop was justified at its inception"; and (2) "whether the officers' actions were reasonably related in scope to the circumstances which justified the

interference in the first place." *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1328).

The Court first considers whether the stop was justified at its inception. "An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1328). Officers are generally entitled to rely on information provided by other officers to support reasonable suspicion to initiate an investigative detention. *Ellsworth*, 2021 WL 1040483, at *4 (citing *Oliver v. Woods*, 209 F.3d 1179, 1190-91 (10th Cir. 2000) (noting that "officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information" and, instead, may "rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention"). Even if that initial information is mistaken, reasonable reliance does not defeat a finding that reasonable suspicion existed. *Ellsworth*, 2021 WL 1040483, at *4 (citing *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) ("A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.")). Thus, even if the persons being stopped are innocent of any crime, a *Terry* investigative stop may be justified at its inception because "*Terry* accepts the risk that officers may stop innocent people." *Ellsworth*, 2021 WL 1040483, at *4 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000)).

By way of example, in *Mocek v. City of Alburquerque*, 813 F.3d at 924, the first legal issue was "whether there was reasonable suspicion to stop [the plaintiff] and request

his identity." In deciding that there was, the Tenth Circuit Court of Appeals emphasized two points. *Mocek*, 813 F.3d at 923-24. The first was the security-sensitive location of the stop, an airport security checkpoint, as discussed at length in connection with Plaintiffs' First Amendment claims. The second point was that the officer "was entitled to rely in good faith" on representations by TSA agents regarding the plaintiff's earlier conduct. *Id.* (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995) (holding an officer's reasonable-suspicion determination could rely on border patrol agent's representations of events that occurred before the officer arrived); *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997) ("Officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion and probable cause for an arrest.")). Ultimately, the Circuit concluded that, "the information available to [the officer] indicated that [the plaintiff] had distracted multiple TSA agents, persistently disobeyed their orders, already caused a 'disturbance' (according to the agents on the scene), and potentially threatened security procedures at a location where order was paramount," all of which meant that "a reasonable officer would have had reason to believe, or at least investigate further, that [the plaintiff] had committed or was committing disorderly conduct." *Mocek*, 813 F.3d at 924.

The evidence is clear that Defendant Lord initiated the stop at issue here. Defendant Bretz had been talking with Plaintiffs but, even viewing the evidence in a light most favorable to Plaintiffs, it is clear from the video and other evidence that he did not detain Plaintiffs. *See, e.g.*, *Ex. 1, Pl. Kerr's Video* [#51] at 20:20-20:25 (Plaintiff Kerr asking Defendant Bretz if Plaintiffs were being detained, and Defendant Bretz responding no). There is also no evidence that Defendant Rech or Defendant Plyter said or did

anything to initiate the stop.  Plaintiffs were walking toward Defendant Lord who told them to stop and sit, thereby initiating the stop.  Thus, the Court finds that the undisputed facts show that the stop was initiated by Defendant Lord, and therefore Defendants Bretz, Rech, and Plyter are entitled to qualified immunity and entry of summary judgment in their favor on this aspect of this claim.

Next, the Court must determine whether the stop initiated by Defendant Lord was "justified at its inception," which is true only "if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."  *Ellsworth*, 2021 WL 1040483, at *3.  In doing so, the Court should not evaluate each fact in isolation but, rather, should examine the totality of the circumstances the officer faced and "accord proper deference to the judgment of an experienced officer."  *United States v. Johnson*, 364 F.3d 1185, 1189-90 (10th Cir. 2004).

In their Motion [#56], Plaintiffs assert that "[t]he only information that Defendants had when they collectively decided to detain and search Plaintiffs was that Plaintiffs 'were walking around Building C, were right in front of Building C and were videotaping everything around the Jail.'"  *Motion* [#56] at 20 (citing *Depo. of Brunkow* [#48-1] ¶ 6; *Ex. 11, Dispatch Call Audio 2* [#56-11; #62] at 0:15-2:45; *Ex. 12, Dispatch Call Audio 3* [#56-12; #62].  The Court notes that Plaintiffs' recitation of the facts is glaringly incomplete, even according to the exhibits they themselves cite.  For example, in Exhibit 11, Deputy Brunkow also reported that Plaintiffs were wearing masks, and in Exhibit 12, Deputy Brunkow reported that one Plaintiff had his hand in his front pocket and that it looked like there was something heavy in the pocket.  *Ex. 11, Dispatch Call Audio 2* [#56-11; #62] at 0:15-2:45; *Ex. 12, Dispatch Call Audio 3* [#56-12; #62].  Plaintiffs' Response [#59] to

Defendants' Motion [#48] does not direct the Court's attention to any additional evidence in connection with their argument. *Response* [#59] at 16-17.

The first factor the Court addresses in examining the totality of the circumstances is the "indicia of reliability" regarding the information Defendant Lord received prior to coming on the scene. *See, e.g.*, *Johnson*, 364 F.3d at 1190. Here, the Court notes that the initial information came from the direct observation of an off-duty officer, Deputy Brunkow, and there is no indication that Defendant Lord should have suspected that any information relayed by Deputy Brunkow was unreliable. *See id.* at 1191.

The second factor concerns Defendant Lord's initial assessment of the scene upon his arrival. *See id.* Here, at a glance, Defendant Lord was able to largely confirm many of Deputy Brunkow's statements, including that Plaintiffs were on Jail property, wearing masks, and filming near a secure area of the Jail. However, even if Plaintiffs were not actively engaged in criminal behavior at that time, Defendant Lord was not required to "have simply abandoned his investigation at this point, blithely sending the couple on their way." *See id.* at 1192. Plaintiffs both denied doing anything wrong, but "[t]he Fourth Amendment does not require police to be so credulous." *Id.* Persons approached by law enforcement "would have had an incentive to lie if they were involved in some other criminal activity," and "[i]t is not an unreasonable inference that" the pair "knew an officer was watching them and behaved accordingly" as officers arrived on scene. *See id.*

The third factor concerns whether Plaintiffs' behavior was "outside the range of normal reactions to police questioning." *See id.* Here, Plaintiffs were verbally combative and uncooperative, although they physically complied with Defendants' directives, such as when Defendant Lord directed them to sit on the ground. They refused to answer

questions such as what they were doing on Jail property, and they refused to provide identification. This behavior could be "characteriz[ed] . . . as within the range of behavior that an innocent person might exhibit under similar circumstances," but it also "might suggest [Plaintiffs] had something to hide." *See id.* Regardless of how a jury might interpret Plaintiffs' behavior, the behavior is still considered as "part of the totality of the circumstances," because "[c]onduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in certain circumstances." *See id.* (citing *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989)). Thus, even "a normal reaction[ ] is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded." *Id.* "'Discounting' something is not the same as 'disregarding it' . . . ." *Id.*

The fourth factor concerns any objects that the officer can observe which may be utilized in the commission of a crime. *Id.* at 1193. "An officer need not actually observe an individual use an object in a criminal manner for it to raise the officer's suspicions." *Id.* (citing *Sokolow*, 490 U.S. at 9-10. In other words, "in some situations" certain objects "may be innocuous," but those same devices/objects may also "'contribute[ ] substantially to the officer's suspicion that criminal activity was afoot.'" *Id.* (quoting *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001)). Here, Plaintiffs were using their cell phones to film a secure area of Jail property and were wearing masks while doing so. While both activities could be innocent—and the evidence is undisputed that the weather was cold that day—these objects certainly may "add[ ] to the aura of illegality and danger" to an officer just arriving on scene. *Id.*

The fifth factor concerns the location where the stop took place.  *Id.* (noting that "the nature of the area in which a detention takes place is a relevant consideration in the *Terry* analysis").  Here, as discussed extensively above in connection with the Court's analysis of Plaintiffs' First Amendment claims, Jail property is not the type of property on which essentially unlimited First Amendment expression is permitted, and unusual behavior on such property, including wandering seemingly aimlessly for a period of time and filming secure areas while wearing identity-concealing masks, is certainly among the factors that an officer may consider.  *See, e.g.*, *Aff. of Mitchell* [#48-2] ¶ 4 ("The staff exit and entry points, including the garage which is used to transport inmates to the Jail, are secure areas.  They are vulnerable areas of the Jail where there is a higher a risk of escape.").

Considering the totality of the circumstances, the Court finds that "a reasonable person might have some doubts . . . about [Plaintiffs'] actual involvement in criminal activity," but "such doubts" do not necessarily make Defendant Lord's "actions unreasonable."  *Id.* at 1194.  "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."  *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  *Id.* (quoting *Arvizu*, 534 at 274).  "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

*Id.* (citation omitted). "Thus, as long as he has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Id.* (emphasis in original).

Here, viewing the facts in a light most favorable to Plaintiffs, the Court finds that Defendant Lord "had a reasonable suspicion that [Plaintiffs] might be involved in one or more criminal activities." *Id.* The evidence shows that "[h]is suspicions were particularized to [Plaintiffs], and were based on how his training and experience taught him to interpret a number of objectively reasonable details." *See id.* "This is more than the 'inchoate and unparticularized suspicion or "hunch"' warned against in *Terry*." *Id.* (quoting *Terry*, 392 U.S. at 27). Taking the facts in a light most favorable to Plaintiffs, based on the totality of the circumstances, the Court finds that no reasonable jury could conclude that it was constitutionally impermissible for Officer Lord "to suspect that criminal activity was afoot." *See id.*; *see, e.g.*, *Ellsworth*, 2021 WL 1040483, at *3-4 (affirming summary judgment and qualified immunity in favor of officers where "[t]he undisputed facts show[ed] that the initial stop of Plaintiffs' vehicle was supported by reasonable suspicion"); *Jones v. Manriquez*, 811 F. App'x 482, (10th Cir. Apr. 23, 2020) (reversing the district court's denial of officers' motion for summary judgment where the undisputed evidence showed "that the officers had reasonable suspicion that [the plaintiff] was trespassing, such that their investigative detention of [the plaintiff] did not violate his Fourth Amendment rights"); *Montgomery v. Bliley*, No. 19-cv-02042-PAB-MEH, 2021 WL 1207442, at *6 (D. Colo. Mar. 31, 2021) ("agree[ing] with the magistrate judge and find[ing] that defendants had reasonable suspicion that plaintiffs were violating Boulder's

trespass ordinance," concluding: "Because they had reasonable suspicion, there is no constitutional violation under the first prong of the qualified immunity test, and defendants are entitled to qualified immunity. Accordingly, summary judgment should enter in favor of defendants."); *Brown v. Bruce*, No. 19-cv-00046-RBJ, 2020 WL 3259065, at *5-7 (D. Colo. June 16, 2020) (determining on a motion for summary judgment that the defendants had reasonable suspicion to initiate an investigatory detention and therefore were entitled to qualified immunity).

Accordingly, the Court finds that Defendants Bretz, Lord, Rech, and Plyter are entitled to qualified immunity and to summary judgment in their favor to the extent Plaintiffs' Fourth Amendment claim is based on initially stopping Plaintiffs.

## ii.    Continued Seizure and Search

The Court next considers whether Defendants acted reasonably after the stop. The Court must determine "whether the officers' actions were reasonably related in scope to the circumstances which justified the interference in the first place." *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1328); *see also Donahue v. Wihongi*, 948 F.3d 1177, 1197-98 (10th Cir. 2020) (stating that, while reasonable suspicion must exist at all stages of a detention, it need not be based on the same facts throughout). There is no dispute that Defendants Bretz, Lord, Rech, and Plyter were present and participated in the events underlying this portion of Plaintiffs' claim.

Here, the Court considers "whether the officers' conduct was such as to place the seizure within the general rule requiring probable cause for a seizure or within *Terry*'s exception to that rule." *Ellsworth*, 2021 WL 1040483, at *3 (quoting *Windom*, 863 F.3d at 1328). "'[P]olice officers need not take unnecessary risks in the line of duty" and "may

take precautionary measures"—including felony-takedown procedures—"that are reasonably necessary to safeguard their personal safety, and to maintain the status quo, during a *Terry* stop." *Ellsworth*, 2021 WL 1040483, at *4 n.5 (quoting *United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007)) (citing *Windom*, 863 F.3d at 1331 ("[W]hen an officer has a reasonable belief that a suspect he is investigating at close range is armed, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.")). Thus, while "[t]he use of firearms, handcuffs, and other forceful techniques *generally* exceed the scope of an investigative detention and enter the realm of an arrest," they do not always do so. *Cortez*, 478 F.3d at 1115-16 (brackets and internal quotation marks omitted) (emphasis added); *see also United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) (holding that the display of weapons and the use of handcuffs exceeded the scope of the *Terry* stop where there was no information "the suspects were armed or violent"). "Instead of rigid criteria, 'common sense and ordinary human experience' guide our analysis of the reasonableness of *Terry* stops." *Ellsworth*, 2021 WL 1040483, at *4 (quoting *Windom*, 863 F.3d at 1329). "Therefore, 'under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground.'" *Ellsworth*, 2021 WL 1040483, at *4 (quoting *Windom*, 863 F.3d at 1329-30) (citing *id.* at 1330 (collecting cases); *Shareef*, 100 F.3d at 1506 (holding that these types of measures did not convert a *Terry* stop into an arrest)).

Here, there is no evidence that Plaintiffs were advised of their *Miranda* rights during the time period immediately after they were stopped. *See Cortez*, 478 F.3d at 1123 (referencing the lack of *Miranda* rights, among other factors, in determining a seizure was a *Terry* stop and not an arrest). In addition, the mere use of force, by itself, does not automatically transform an investigative detention into an arrest. *See generally Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (noting that officers need not "use the least intrusive means" during an investigative detention). In short, even if a detention is "more intrusive than an ordinary *Terry* stop," the issue remains whether "the precautionary measures of force employed by the officers were reasonable under the circumstances." *Ellsworth*, 2021 WL 1040483, at *6 (quoting *Windom*, 863 F.3d at 1333). Where "the officers' actions were reasonably related in scope to the circumstances which justified the [stop] in the first place," the stop does not develop into an arrest. *Ellsworth*, 2021 WL 1040483, at *6 (quoting *Windom*, 863 F.3d at 1328). The Court notes that Plaintiffs' "'subjective beliefs are irrelevant'" in deciding whether Plaintiffs were arrested." *Ellsworth*, 2021 WL 1040483, at *6 n.8 (quoting *Cortez*, 478 F.3d at 1117 n.8).

Here, the undisputed facts show that the actions of Defendants Bretz, Lord, Rech, and Plyter following the initial stop up to the point of the actual arrests of Plaintiffs were reasonable as a matter of law. This is not a situation where Defendants were able to quickly assess the nature of what was happening, i.e., whether Plaintiffs' conduct was indeed innocent. As previously noted, Plaintiffs were verbally combative and refused to answer questions about they were doing, and there had been a report that one of them appeared to be carrying something heavy in his front pocket, which the officers reasonably took as the *possibility* that at least one of the men had a weapon. Ultimately,

no weapons were found on either Plaintiff. *See, e.g.*, *Ex. 9* [#56-9] at 2:52-3:00 (finding nothing on Plaintiff Schiller); *Ex. 6, Def. Bretz's Body Worn Camera Video* [#51] at 4:05-5:40 (finding sunglasses and keys on Plaintiff Schiller); *Ex. 9, Def. Lord's Body Worn Camera Video* [#51] at 2:26-2:33, 3:11; *Ex. 10, Def. Plyter Body Worn Camera Video* [#51] at 1:41; *Defs.' Ex. 12, Depo. of Def. Bretz* [#94-1] at 44:13-15; *Defs.' Ex. 13, Depo. of Lord* [#94-2] at 67:2-7; *Defs.' Ex. 14, Depo. of Plyter* [#94-3] at 28:1-3; *Defs. Ex. 15, Depo. of Reiss* [#94-4] at 12:23-24; *Defs.' Ex. 16, Depo. of Kellison* [#94-5] at 12:22-24. Nevertheless, that fact could only be known in hindsight after the searches occurred. Thus, even taking the facts in a light most favorable to Plaintiffs, the Court finds that no reasonable jury could find that Defendants' actions in briefly detaining Plaintiffs, even in handcuffs, and searching them for weapons, given the information conveyed by Deputy Brunkow, were constitutionally unreasonable under the circumstances then known to Defendants.

Accordingly, the Court finds that Defendants Bretz, Lord, Rech, and Plyter are entitled to qualified immunity and to summary judgment in their favor to the extent Plaintiffs' Fourth Amendment claim is based on the period between the initial stop and the actual arrests, including the search of Plaintiffs.

### iii.    False Arrest

"In the context of a false arrest claim, an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime." *Meadows v. The City of Oklahoma City*, __ F. App'x __, __, No. 20-6041, 2021 WL 1098620, at *2 (10th Cir. Mar. 23, 2021) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)). "Probable cause requires only a 'fair probability'

of illegal conduct, not 'proof that something is more likely true than false.'" *Meadows*, 2021 WL 1098620, at *2 (quoting *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014)). "It is measured by the totality of the circumstances." *Meadows*, 2021 WL 1098620, at *2 (citing *Illinois v. Gates*, 462 U.S. 213, 232-33 (1983)). The "assessment of probable cause must be based on what the officer knew at the time." *Meadows*, 2021 WL 1098620, at *2 (citing *Cortez*, 478 F.3d at 1116 (stating that "we ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause")).[11]

Here, the undisputed facts show that the actions of Defendants Bretz, Lord, Rech, Plyter, Reiss, and Kellison in relation to Plaintiffs' arrests were supported by probable cause. After Plaintiffs were handcuffed, Defendant Lord asked Defendant Kellison, at approximately 2:48 on Defendant Lord's body camera video, whether the property was Jail property, and Defendant Kellison answered, "Yes." *Ex. 9, Lord's Body Camera Video*. Plaintiffs were brought to their feet and told by Defendant Lord that they were under arrest, at which point Plaintiffs were escorted over and into the Jail building itself. *Ex. 9, Depo. of Lord* [#93-9] at 49:22-24, 52:8-14 (referencing the 3:14 time stamp on Defendant Lord's body camera); *see also Ex. 8, Depo. of Reiss* [#93-8] at 18:14-19 (stating his belief that Defendant Lord had arrested Plaintiffs). Defendant Reiss is the officer who made the decision to move Plaintiffs inside the Jail. *Ex. 4, Incident Report by Reiss* [#56-4] at 1.

---

[11] To the extent Plaintiffs argue that *actual* probable cause is required rather than *arguable* probable cause, the Court rejects this argument. *Response* [#59] at 15-16, 15 n.3, 16 n.4; *see Sexton*, 2021 WL 1210375, at *6 n.5 (holding that arguable probable cause is all that is required even for a warrantless arrest) (citing *Corona v. Aguilar*, 959 F.3d 1278, 1285 (10th Cir. 2020)).

Plaintiffs were arrested pursuant to Colo. Rev. Stat. § 18–9–117(1), which makes it a criminal misdemeanor "for any person to enter or remain in any public building or on any public property or to conduct himself or herself in or on the same in violation of any order, rule, or regulation concerning any matter prescribed in this subsection (1), limiting or prohibiting the use or activities or conduct in such public building or on such public property, issued by any officer or agency having the power of control, management, or supervision of the building or property. . . ." Pursuant to Colo. Rev. Stat. § 30–10–511, "the sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer." Pursuant to Colo. Rev. Stat. § 17–26–102, "[t]he sheriff of the county, in person or by deputy appointed for that purpose, shall be the keeper of the county jail. He shall be responsible for the manner in which the same is kept."

These three statutes, in short, permit the sheriff to issue orders, rules, or regulations on certain specified matters with respect to jail property. The statutes, by their plain language, do not *on their own* prohibit any conduct. While the parties inexcusably do not explicitly say so, the Court infers from the briefs that the "order, rule, or regulation" at issue here is reflected solely by the signs posted on various sidewalks prohibiting trespassing.

The issue here is not whether Plaintiffs *actually* trespassed but whether Defendants had probable cause to believe that they had. At the time of the arrest (as opposed to the time of the initial investigatory detention), the officers had the following information: (1) Dispatch had received a report that several men in ski masks were recording and/or photographing the Jail, *Pls.' Ex. 4* [#56-4] at 2; *Pls.' Ex. 3* [#56-3] at 2;

(2) Jail officers received a report that a maroon truck had pulled up in front of the lobby and may have been involved in the situation, *Pls.' Ex. 4* [#56-4] at 2; (3) Boulder Police Department officers had instructed two men to lay prone on the ground and had handcuffed them, *id.*; (4) a third male left the area through the Valmont bike park once the Boulder police officers arrived, *id.*; (5) the two men on the ground were uncooperative, *id.*; (6) there was a heated conversation between the men and the Boulder police officers; Boulder police officers had asked the men for names and identification, but instead of providing that information, both responded "Fuck off," that their First Amendment rights were being violated, that they didn't have to tell officers anything, and that they "didn't do anything fucking wrong," *id.*; (6) Defendant Lord asked Defendant Reiss if the two men should be taken to the Jail, *id.*; (7) taking Plaintiffs to the Jail would allow the officers to take "quick control of a still unknown situation," *Pls.' Ex. 3* [#56-3] at 2; (8) at the time of their arrest, Plaintiffs were located on Jail property, *Defs.' Ex. 1, Pl. Kerr's Video* [#51] at 18:18-22:00; and (9) Plaintiffs were given the option to either provide their names and receive a ticket or refuse and be booked into the jail, *Ex. 15, Pl. Schiller's Video* [#56-15] at 4:25-34.

It is undisputed that none of the arresting officers saw Plaintiffs trespass; indeed, it is undisputed that Plaintiffs never actually trespassed. Thus, their belief that there was probable cause to arrest Plaintiffs for trespass stemmed solely from statements made by Deputy Brunkow to Defendant Bretz and possibly to Defendant Rech, and in his two calls to Dispatch. It is further undisputed that Deputy Brunkow himself never explicitly stated that he saw Plaintiffs trespassing. *See, e.g.*, *Aff. of Brunkow* [#48-1]; *Brunkow Supp. Report* [#56-5]; *Depo. of Brunkow* [#93-3]. There is no evidence that Deputy Brunkow,

or anyone else, saw Plaintiffs in any area where the witness *mistakenly* believed that Plaintiffs were trespassing. Plaintiffs had been wandering the grounds for more than fifteen minutes at the time of their detention, but there is no evidence before the Court that the arresting officers were provided with information, mistaken or not, that Plaintiffs had actually trespassed.

However, while it is clear from the foregoing that there was no *actual* probable cause, the Court finds that there was *arguable* probable cause, which, as mentioned above, is all that is required by applicable Tenth Circuit precedent. This conclusion stems from the unrefuted evidence presented regarding Defendants' reasonable interpretation of statements by Deputy Brunkow, Dispatch, and other officers to mean that Plaintiffs were trespassing on Jail property.

To reiterate, Deputy Brunkow's call to dispatch included the following exchange:

*Brunkow*: There are two guys out here that have all faces masked up and all that stuff, and they're walking around doing a movie around Building C.
*Dispatcher*: Building C?
*Brunkow*: On their video camera.
*Dispatcher*: Okay. See—
*Brunkow*: They have balaclavas on and . . .
*Dispatcher*: [typing] okay . . .
*Brunkow*: [inaudible] that would be the City. Either one. Yeah. I think to the—
*Dispatcher*: I can never remember if it's ours or theirs. If it's in or outside. We'll get someone though. Someone over there. They're near Building C, you said?
*Brunkow*: Yeah, they're walking back over towards the—yeah they're right in front of Building C. One's got a green jacket on, blue jeans, a black balaclava on. The other guy's got a black hooded jacket and blue jeans with a white doctor's mask over his face.
*Dispatcher*: [typing] okay.
*Brunkow*: I would contact them, but I'm not in uniform, so—
*Dispatcher*: Yeah, that's fine. Alright we'll let them—
*Brunkow*: [inaudible] pull into the parking lot to see what they're doing. They're still videotaping everything around the Jail—
*Dispatcher*: Okay.

*Brunkow*: On their iPhones.
*Dispatcher*: Sounds good.

*Defs.' Ex. 5, Dispatch Audio* [#51]; *see also Aff. of Brunkow* [#48-1] ¶ 5.  Deputy Brunkow

also relayed substantially similar information to Defendant Bretz after the latter's arrival.

*Defs.' Ex. 6, Def. Bretz's Body Worn Camera Video* [#51] at 0:00-0:42; *Aff. of Brunkow*

[#48-1] ¶ 8.  Dispatch placed a call to responding officers as follows: "Boulder County Jail

at 3200 Airport Road, males with masks around the building filming, a male in black

hoodies and blue jeans with a white doctor's mask and some other masks."  *Defs.' Ex. 7,*

*Police 1 Dispatch Recording* [#51] at 00:14-00:26.

Even viewing the evidence in a light most favorable to Plaintiffs, the Court finds

that Defendants "could have reasonably believed that probable cause existed" in light of

statements made by Deputy Brunkow and Dispatch.  *See Felders ex rel. Smedley v.*

*Malcom*, 755 F.3d 870, 879 (10th Cir. 2014).  Those statements include that Plaintiffs

were "around Building C," "near Building C," "right in front of Building C," and, more

generally, "around the building."  The evidence shows that the area immediately around

Building C was marked with signs prohibiting trespassing.  *Aff. of Mitchell* [#48-2] ¶¶ 6-8

("All sidewalks approaching Building C were closed to members of the public and were

posted with 'No Trespassing' signs.").  None of these statements specify just how close

Plaintiffs were to Building C, but a reasonable officer could easily interpret them to mean

that Plaintiffs had been in the trespassing zone next to the building.  Therefore, the Court

finds that Defendants had arguable probable cause to arrest Plaintiffs for trespass based

on the information relayed to them that Plaintiffs had been "around," "near," and "right in

front of" Building C.  Even if incorrect, the information contained in Deputy Brunkow's

observations supports a finding of arguable probable cause that Plaintiffs had committed trespass.

Accordingly, the Court finds that Defendants Bretz, Lord, Rech, Plyter, Reiss, and Kellison are entitled to qualified immunity and to summary judgment in their favor to the extent Plaintiffs' Fourth Amendment claim is based on false arrest.

## B.    Municipal Liability

Plaintiffs' Claim One (First Amendment right to film), Claim Two (First Amendment retaliation), and Claim Four (Fourth Amendment search, seizure, and false arrest) are all asserted against Defendant City of Boulder, Colorado.  *Am. Compl.* [#34] at 7, 11, 14-15. There is no dispute that only Defendants Lord, Bretz, Plyter, and Rech were employed by the City of Boulder.  *Am. Compl.* [#34] ¶¶ 7-10.  The other two individual Defendants, Reiss and Kellison, were employed by the County of Boulder.  *Id.* ¶¶ 11-12.  The parties do not dispute that only the purportedly unconstitutional actions of Defendants Lord, Bretz, Plyter, and Rech can be considered in connection with the municipal liability claims against the City of Boulder.

The City of Boulder is a local government which cannot be sued under 42 U.S.C. § 1983 on a theory of respondeat superior.  *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978).  Rather, entities like the City of Boulder can be sued directly only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

A municipal liability claim is comprised of two elements of proof: (1) a municipal employee committed a constitutional violation; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). As to the first element, the Court has held, as discussed at length above, that there were no constitutional violations with respect to Defendants' First Amendment or Fourth Amendment claims. Thus, the City is entitled to summary judgment in its favor. *See Jiron*, 392 F.3d at 419 n.8 ("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation—i.e., the first step of the qualified immunity analysis—a finding of qualified immunity does preclude the imposition of municipal liability.").

Accordingly, the Court finds that the City of Boulder is entitled to summary judgment in its favor to the extent Plaintiffs' First and Fourth Amendment claims are asserted against it.

## IV. Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that Defendants' Motion [#48] is **GRANTED**.

IT IS FURTHER **ORDERED** that Plaintiffs' Motion [#56] is **DENIED**.

IT IS FURTHER **ORDERED** that summary judgment shall enter in favor of Defendants on Plaintiffs' claims.

IT IS FURTHER **ORDERED** that the joint Final Pretrial Conference, Jury Instructions Conference, and Trial Preparation Conference set for July 8, 2021, at 2:00 p.m. is **VACATED**.

IT IS FURTHER **ORDERED** that the five-day Jury Trial set for August 9-13, 2021, is **VACATED**.

IT IS FURTHER **ORDERED** that the Clerk of Court shall **ENTER** Final Judgment and **CLOSE** this case.

Dated: June 18, 2021

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge